Nos. 16-17282, 17-15302, 17-15352 (Consolidated)

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

VICTOR ANTONIO PARSONS, et al.,

*Plaintiffs-Appellees,*

v.

CHARLES L. RYAN, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Arizona,
Case No. 2:12-cv-00601-DKD

## ANSWERING BRIEF OF PLAINTIFFS-APPELLEES

David C. Fathi
Amy Fettig
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
(202) 548-6603

Kathleen E. Brody
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
(602) 650-1854

Donald Specter
Alison Hardy
Corene Kendrick
Rita K. Lomio
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
(510) 280-2621

*Attorneys for Prisoner Plaintiffs/Appellees*

Maya Abela
Rose A. Daly-Rooney
**ARIZONA CENTER FOR
DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
(520) 327-9547

*Attorneys for Plaintiff/Appellee
Arizona Center for Disability Law*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellee Arizona Center for Disability Law certifies that it is a registered 501(c)(3) nonprofit organization, and discloses that it has no parent corporation and that no publicly held corporation holds ten percent (10%) or more of its stock.

Dated: May 12, 2017

Respectfully submitted,

ARIZONA CENTER FOR DISABILITY LAW

By: s/ Maya S. Abela

Maya S. Abela
Rose A. Daly-Rooney
177 North Church Avenue
Suite 800
Tucson, AZ 85701
(520) 327-9547

*Attorneys for Plaintiff-Appellee Arizona Center for Disability Law*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..................................................... i

TABLE OF AUTHORITIES ............................................................................ iv

INTRODUCTION ............................................................................................ 1

JURISDICTIONAL STATEMENT .................................................................. 3

ISSUES PRESENTED ...................................................................................... 3

STATEMENT OF THE CASE .......................................................................... 4

SUMMARY OF THE ARGUMENT ................................................................ 10

ARGUMENT ................................................................................................... 12

   I.    THIS COURT LACKS JURISDICTION TO HEAR THIS APPEAL ................... 12

      A.  The Order at Issue is Not Final and is Therefore Not Appealable under 28 U.S.C. § 1291. ............................................................................. 13

          1.  The District Court's Order is Not Appealable Under the Collateral Order Doctrine.. ................................................................ 18

      B.  The Order at Issue Does Not Modify the Stipulation and is Therefore Not Appealable Under 28 U.S.C. § 1292 (a)(1). ........................................ 19

  II.   EVEN IF THIS COURT HAD JURISDICTION, THE DISTRICT COURT PROPERLY FOUND THAT DEFENDANTS PROVIDED INSUFFICIENT EVIDENCE TO JUSTIFY REDEFINING THE SUBCLASS ................................................................................ 22

      A.  Standard of Review .......................................................... 22

      B.  The District Court Properly Based its Decision on Evidence Provided by Defendants.......................................................... 24

1.  Defendants Failed to Meet the High Standards of Either Rule 60(b)(6) or LR Civ. 7.2(g) ...................................................................................... 25

2.  Defendants Failed to Provide Credible Evidence to Support their Claim.. .............................................................................................................. 27

III.  IN THE ALTERNATIVE, THE PLAIN LANGUAGE OF THE SUBCLASS DEFINITION SUPPORTS THE DISTRICT COURT'S RULING ........................................................................................................... 32

A.  Standard of Review ................................................................................ 32

B.  The Subclass Definition in the Class Certification Order and Stipulation Clearly Supports the District Court's Holding. .................................... 32

CONCLUSION .................................................................................................... 35

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Anderson v. City of Bessemer City*,
  470 U.S. 564 (1985)....................................................................23

*Armstrong v. Schwarzenegger*,
  622 F.3d 1058 (9th Cir. 2010) ......................................15, 17, 22

*Balla v. Idaho State Board of Corrections,*
  869 F.2d 461 (9th Cir. 1989) .....................................................15

*Bias v. Moynihan*,
  508 F.3d 1212 (9th Cir. 2007) ...................................................24

*Botefur v. City of Eagle Point*,
  7 F.3d 152 (9th Cir. 1993) .........................................................33

*Carreon v. Barr*,
  66 F.3d 334 (9th Cir. 1995) .......................................................22

*Carson v. American Brands, Inc.*,
  450 U.S. 79 (1981)........................................................19, 20, 21

*Casey v. Albertson's Inc.*,
  362 F.3d 1254 (9th Cir. 2004) ...................................................23

*Christian v. Mattel, Inc.*,
  286 F.3d 1118 (9th Cir. 2002) ...................................................24

*Cohen v. Beneficial Indus. Loan Corp.,*
  337 U.S. 541 (1949)...................................................................18

*County of Santa Clara v. Astra USA, Inc.*,
  401 F. Supp. 2d 1022 (N.D. Cal. 2005).....................................30

*Daniels–Hall v. National Education Association*,
  629 F.3d 992 (9th Cir. 2010) .....................................................29

*De Saracho v. Custom Food Mach., Inc.*,
  206 F.3d 874 (9th Cir. 2000) ...................................................................22

*Delay v. Gordon*,
  475 F.3d 1039 (9th Cir. 2007) .................................................................22

*Digital Equip. Corp. v. Desktop Direct, Inc.*,
  511 U.S. 863 (1994)..................................................................................18

*Disabled Rights Action Comm. v. Las Vegas Events, Inc.*,
  375 F.3d 861 (9th Cir. 2004) ...................................................................15

*Fisher v. Tucson Unified School Dist.*,
  588 Fed. Appx. 608 (9th Cir. 2014) ........................................................20

*Flores v. Lynch*,
  828 F.3d 898 (9th Cir. 2016) ...................................................................14

*Gastile v. Virga*,
  15-16294, 2016 WL 6520090, *1 (9th Cir. Nov. 3, 2016)........................14

*Gates v. Gomez*,
  60 F.3d 525 (9th Cir. 1995) .....................................................................14

*Gon v. First State Ins. Co.*,
  871 F.2d 863 (9th Cir. 1989) ...................................................................14

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
  485 U.S. 271 (1988)..................................................................................14

*Hall v. N. Am. Van Lines, Inc.*,
  476 F.3d 683 (9th Cir. 2007) ...................................................................32

*Hinton v. Pac. Enterprises*,
  5 F.3d 391 (9th Cir. 1993) .......................................................................24

*In re Amgen Inc. Sec. Litig.*,
  544 F. Supp. 2d 1009 (C.D. Cal. 2008)....................................................30

*In re Cement and Concrete Antitrust Litig.*,
 817 F.2d 1435 (9th Cir. 1987), *vacated on other grounds*,
 940 F.2d 1583 (9th Cir. 1991) ................................................................... 34

*In re Touch America Holdings, Inc. ERISA Litig.*,
 563 F.3d 903 (9th Cir. 2009) ..................................................................... 20

*Jeff D. v. Andrus*,
 899 F.2d 753 (9th Cir. 1990) ..................................................................... 33

*Jeff D. v. Kempthorne*,
 365 F.3d 844 (9th Cir. 2004) ................................................... 11, 13, 14, 25

*Jones v. Ryan,*
 733 F.3d 825 (9th Cir. 2013) ............................................................... 17, 25

*Lal v. California*,
 610 F.3d 518 (9th Cir. 2010) ..................................................................... 25

*Mitchell v. Forsyth*,
 472 U.S. 511 (1985) .................................................................................... 17

*Mohawk Indus., Inc. v. Carpenter,*
 558 U.S. 100 (2009) .................................................................................... 18

*Molloy v. Wilson*,
 878 F.2d 313 (9th Cir. 1989) ..................................................................... 23

*Muniz v. United Parcel Serv., Inc.*,
 738 F.3d 214 (9th Cir. 2013) ..................................................................... 32

*Nat'l Distribution Agency v. Nationwide Mut. Ins. Co.*,
 117 F.3d 432 (9th Cir. 1997) ..................................................................... 16

*P. v. Riles*,
   502 F.2d 963 (9th Cir. 1974) .................................................................. 23

*Parsons v. Ryan*,
   289 F.R.D. 513 (D. Ariz. 2013), *aff'd*, 754 F.3d 657 (9th Cir. 2014) ........ 32

*Pelletier v. Fed. Home Loan Bank of San Francisco*,
   968 F.2d 865 (9th Cir. 1992) .................................................................. 17

*Plata v. Brown*,
   754 F.3d 1070 (9th Cir. 2014) ......................................................... 14, 19

*Poland v. Martin*,
   761 F.2d 546 (9th Cir. 1985) .................................................................. 33

*Rishor v. Ferguson*,
   822 F.3d 482 (9th Cir. 2016) .................................................................. 24

*Rodriguez v. Disner*,
   688 F.3d 645 (9th Cir. 2012) .................................................................. 31

*Rufo v. Inmates of Suffolk County Jail*,
   502 U.S. 367 (1992).............................................................................. 25

*SEC v. Coldicutt*,
   258 F.3d 939 (9th Cir. 2001) .................................................................. 22

*Smart v. Ashcroft*,
   36 F. App'x 909 (9th Cir. 2002) ............................................................. 26

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) .................................................................. 31

*Stefano v. City of Long Beach*,
   621 F. App'x 404 (9th Cir. 2015)............................................................ 14

*Tabi v. Ortega*,
    649 F. App'x 413 (9th Cir. 2016) ............................................................. 14

*Thompson v. Enomoto*,
    815 F.2d 1323 (9th Cir. 1987) ....................................................... 20, 21, 22

*Trader Joe's Co. v. Hallatt*,
    835 F.3d 960 (9th Cir. 2016) ..................................................................... 24

*Truckstop.net, LLC v. Sprint Corp.*,
    547 F.3d 1065 (9th Cir. 2008) ................................................................... 19

*United States v. El Dorado County, Cal.*,
    704 F.3d 1261 (9th Cir. 2014) ................................................................... 20

*United States v. Martin*,
    226 F.3d 1042 (9th Cir. 2000) ................................................................... 17

*United States v. Vistoso Partners*,
    No. CV10–0444 PHX DGC, 2011 WL 2550387
    (D. Ariz. June 27, 2011) ........................................................................... 26

*United States v. Warren*,
    601 F.2d 471 (9th Cir. 1979) ..................................................................... 26

*United States v. Washington*,
    761 F.2d 1404 (9th Cir. 1985) ................................................................... 19

*United States v. Winkles*,
    795 F.3d 1134 (9th Cir. 2015) ................................................................... 16

*Wilcox v. Arpaio*,
    753 F.3d 872 (9th Cir. 2014) ..................................................................... 14

*Will v. Hallock*,
    546 U.S. 345 (2006) .................................................................................. 18

*Yagman v. Republic Ins.*,
  987 F.2d 622 (9th Cir. 1993) ....................................................................24

## STATUTES

28 U.S.C. § 1291 ...............................................................................*passim*
28 U.S.C. § 1292 ...................................................................................3, 19
28 U.S.C. § 1292(a)(1) ......................................................................*passim*

## RULES

D. Ariz. LRCiv. 7.2(g) ...................................................................3, 17, 25
D. Ariz. LRCiv. 7.2(g)(1) ............................................................23, 26, 27
Fed. R. Civ. P. 23 ....................................................................................30
Fed. R. Civ. P. 60 ..............................................................................16, 25
Fed. R. Civ. P. 60(b) .........................................................................*passim*
Fed. R. Civ. P. 60(b)(6).....................................................................25, 27

## INTRODUCTION

This case involves a statewide class action settlement involving over 33,000 men and women in Arizona's ten state prisons and a Subclass of approximately 3,000 prisoners confined in isolation. ER 0020; 149-151. The settlement agreement – known as the "Stipulation" – sets forth a comprehensive set of performance measures for both the health care class and the isolation Subclass. ER 101-147. This appeal arises from Defendants'/Appellants' (hereinafter "Defendants") attempt to redefine the isolation Subclass more than two years after the parties reached settlement and more than three years after the district court certified the class. ER 0080-100; ER 149-151. Defendants attempt an end-run around the Stipulation's definition of the isolation Subclass by creating new labels to describe prisoners in substantially similar conditions. Here, the new label Defendants use is "close custody" rather than the former label of "maximum custody." But neither label was used in the district court's definition of the isolation Subclass, which focused instead on conditions – "confinement in a cell for 22 hours or more each day" – or confinement in certain enumerated housing units. ER 0081.

As explained below, this Court lacks jurisdiction to review the district court's ruling regarding Defendants' efforts to redefine the Subclass. The orders at issue here do no more than interpret the Subclass definition. They are therefore not

final orders or orders modifying the Stipulation appropriate for review under 28 U.S.C. § 1291 or § 1292(a)(1).

The district court appropriately responded to the Defendants' attempt to de-populate the isolation Subclass by labeling prisoners "close custody," requiring them to provide evidence of the actual conditions in "close custody" to establish that the new label actually referred to conditions that are materially different than "maximum custody." ER 0011. The court properly considered the evidence Defendants proffered and concluded that they had failed to establish that conditions in "close custody" were materially different from those the Subclass had experienced since the outset of this litigation. ER 002. But the district court made an exception with regard to "close custody" prisoners for whom additional evidence demonstrated that they work twenty hours a week or more. ER 008-009. Those prisoners were found to no longer be part of the Subclass, and the district court requested that the parties work together to develop a methodology for excluding them from the Subclass or request the Court's assistance to do so. ER 009. Instead, Defendants appealed.

Even if this Court had jurisdiction, the district court acted well within its discretion to interpret the Stipulation and to find that Defendants' efforts to de-populate the isolation Subclass were unsupported by the evidence they proffered. Moreover, the plain language of the Subclass definition in both the class

certification order and Stipulation supports the district court's order interpreting the scope of the Subclass.

## JURISDICTIONAL STATEMENT

1.     For the reasons set forth in the Argument Section, I.A, *infra*, at 13, this Court lacks jurisdiction under 28 U.S.C. § 1291.

2.     For the reasons set forth in the Argument Section, I.B, *infra*, at 19, this Court lacks jurisdiction under 28 U.S.C. § 1292.

## ISSUES PRESENTED

1.     Whether the district court's interpretation of the Subclass definition set forth in the Stipulation is an appealable order, where the court did not issue an order enforcing the Stipulation.  ER 002-004.

2.     Whether the district court properly concluded that Defendants failed to meet either the standard for relief from a judgment under Federal Rule of Civil Procedure 60(b) or a motion for reconsideration under District of Arizona Local Civil Rule 7.2(g) when it concluded that Defendants' proffered evidence was insufficient to exclude certain prisoners from the Subclass definition.  ER 002.

3.     In the alternative, whether the plain language of the isolation Subclass definition in the Stipulation supports the district court's interpretation of the scope of the Subclass.  ER 001; SUPP ER 002-003.

## STATEMENT OF THE CASE

This is a case about extreme isolation and the harmful impacts of solitary confinement in the Arizona Department of Corrections (ADC). ER 00202-207. When this lawsuit was commenced, many prisoners held in ADC's isolation units went months or years without meaningful human interaction. ER 00204. Most were confined continually to their cells, allowed to leave no more than three times a week for a brief shower and no more than two hours of "exercise" in a small, barren "rec pen." ER 00203. These isolation units are designed to minimize human contact and environmental stimulation: cells doors have solid steel doors; there are no windows to the outside; and the cell is illuminated 24 hours a day. ER 00204. Extreme idleness with limited access to radio, television, or reading materials left many prisoners in the isolation units with nothing to do but sleep, sit, or pace in their cells. *Id*.

Such conditions are devastating for individuals with pre-existing mental illness and are well known to create extreme mental health problems in previously healthy individuals. ER 00205-206. The lack of adequate mental health care in the isolation units severely exacerbated the already devastating impacts of isolation on the men and women living there. ER 00206-207. Living in these extreme and inhumane conditions ultimately leads prisoners to psychiatric deterioration, self-harm, and suicide. *Id*.

After reviewing the evidence related to the isolation units in this case, the district court's class certification order adopted the following definition of the isolation Subclass:

> All prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day *or* confinement in the following housing units: Eyman-SMU [Special Management Unit] I; Eyman-Browning Unit; Florence-Central Unit; Florence-Kasson Unit; or Perryville-Lumley Special Management Area.

ER 00150 (emphasis added). The same definition was later adopted without modification as part of the Stipulation in this case. ER 0081.

As the district court noted, "[t]hese inmates were historically considered maximum custody inmates" in the ADC. ER 001. As a result, the corrections nomenclature of "maximum custody" is used for the isolation Subclass throughout the Stipulation, including the terms agreed upon by the parties to ameliorate the harmful effects of isolation on the Subclass, ER 0085-91; the text of many of the performance measures related to the Subclass, ER 00138-139;[1] and some of the protocols for assessing Defendants' compliance with the performance measures, ER 00141-45.

---

[1] The exceptions are Performance Measures ##3, 7, 8, and 9. Performance Measure #9, for example, incorporates all use of force incidents "involving prisoners who are designated [seriously mentally ill]" or housed in enumerated units. ER 00139.

Over two years after the Stipulation was signed, Defendants informed the district court that some of the Subclass members were now included in a new category of prisoners labeled "close custody" rather than "maximum custody."  ER 0011.  As a result, Defendants argued that these prisoners were now excluded from the isolation Subclass because they were no longer labeled "maximum custody."  ER 001.  This announcement took place when Defendants denied Plaintiffs/Appellees (hereinafter "Plaintiffs") access to two prisoner records – one in Florence-Central unit and another in Eyman-SMU I – that should have been available under the terms of the Stipulation, which provides that each month Plaintiffs may request and Defendants shall provide "a maximum of five (5) individual Subclass Members' health care and institutional records[.]"  ER 0091; SUPP ER 005.

Defendants' refusal to produce these two prisoner records ultimately led to the three orders which underlie this appeal.  In the first order issued on November 8, 2016, the district court asked Defendants to provide "competent, admissible evidence demonstrating that (1) the enumerated facilities [in the isolation Subclass definition] no longer house maximum custody inmates and (2) the conditions of close custody are substantially different from maximum custody such that close

custody inmates would not otherwise qualify for protection under DI-326."[2] ER 011. In the second order issued on December 23, 2016, the district court assessed the evidence presented by Defendants and found they had failed to establish that conditions for "close custody" prisoners were substantially different from those in maximum custody. ER 007-009. Accordingly, the court concluded that the majority of those prisoners labeled "close custody" remained part of the isolation Subclass. ER 008-009. In the third order issued on February 6, 2017, the district court denied Defendants' "Motion for Relief" and "Notice and Request for Temporary Suspension of Order" of the December 23, 2016 order. ER 001-004.

In response to the district court's November 18, 2016 order, Defendants provided a declaration pertinent to just one of the units at issue – Florence-Central; in particular Cell Block 1 (CB 1), Cell Block 3 (CB 3), and Cell Block 4 (CB 4). ER 0021-27.

In assessing the evidence contained in the Declaration of Carson McWilliams (ER 017-061) – the only evidence Defendants submitted – the district court noted that:

> Defendants have only described the potentially available programming available to close custody inmates at a subset of the

---

[2] Director's Instruction #326 ("DI-326") is a policy of the Arizona Department of Corrections that sets forth a step program for maximum custody prisoners that progressively allows greater socialization, privileges, and out-of-cell time. *See* ER 0035-0061. Some of the requirements of DI 326 were incorporated into the Stipulation. ER 00138-139.

units enumerated in the subclass definition. In other words, Defendants have provided a theoretical explanation of what close custody inmates may experience without showing that any particular inmate actually has experienced these out-of-cell options.

ER 008. The district court found that this type of evidence "is not sufficient to show that inmates classified as close custody are subject to substantially different conditions than maximum custody inmates." *Id.* As a result, the district court found that "close custody" prisoners are subject to "substantially similar conditions" to "maximum custody" prisoners and therefore remain in the isolation Subclass. *Id.*

At the same time, the district court found that Defendants had provided evidence that approximately 276 of the "close custody" prisoners had jobs, working an average of 30 hours per week. Defendants' evidence included job titles and how many prisoners work in a particular position. ER 008-009. The district court noted that "[t]he specificity of this information makes it clear that a close custody inmate who works in this program does, in fact, experience substantially different conditions than the Subclass." ER 009. As a result, the district court concluded that:

> [A]ny close custody inmate who works at least 20 hours a week in the job program described by Defendants will not be considered a member of the Subclass. The Court acknowledges that this raises additional questions such as how many weeks of work are required and does 20 hours/week mean an average or a minimum? The Court asks the parties to meet-and-confer to develop a workable solution,

-8-

and, if that cannot be done, to notify the Court so that a definition can be developed.

ER 009. No such plan has ever been submitted to the district court despite the court's denial of "Defendants' Notice and Request for Temporary Suspension of Order Regarding Close Custody." ER 004; ER 438-447.

In denying Defendants' motion, the district court responded to Defendants' allegations that the court overlooked the "undisputed fact" that "close custody" prisoners are "guaranteed" 15.5 hours of out-of-cell time a week. ER 002. As the district court noted, "Defendant[s'] evidence focused on offered or potentially available out-of-cell time and did not provide admissible evidence to support the claim of 15.5 hours of guaranteed out-of-cell time." *Id.* Indeed, some of the activities "counted" in Defendants' hypothetical list are not available to all prisoners. For example, in asserting that all prisoners are offered 15.5 hours per week out-of-cell time, Defendants counted visitation, religious services, and trips to commissary, despite the fact that not all prisoners receive visits, adhere to a religion for which services are offered (or any religion at all), or have money to purchase commissary items. Defs.-Appellants' Opening Br. ("Opening Br.") at 15. For other activities, such as education, horticulture class, library and programming, Defendants offer no evidence of how many prisoners were actually given such out-of-cell opportunities. ER 0022-0026.

Moreover, the court noted that the difference between 15.5 hours/week for "close custody" and 14 hours/week for the subclass amounts to just under 13 minutes each day and is thus "a distinction without a difference." ER 002. The district court's orders here are merely an interpretation of the scope of the isolation Subclass, unaccompanied by any enforcement order. Indeed, the court never even ordered Defendants to produce the two prisoner files that precipitated the dispute. ER 001-004; ER 005-009.

According to Defendants there are approximately 3,156 prisoners in the ADC system classified as maximum custody and about 578 cells classified as "close custody" at the Florence-Central unit. ER 0020. Excluding the 276 prisoners the district court has removed from the Subclass (ER 008-009), the issue now before the Court involves approximately 302 prisoners.

## SUMMARY OF THE ARGUMENT

More than two years after settlement in this case Defendants attempted to redefine the isolation Subclass by reclassifying some prisoners as "close custody." After carefully considering Defendants' proffered evidence, the district court interpreted the Subclass definition and concluded that Defendants had failed to establish a change in conditions sufficient to exclude the newly-minted "close custody" prisoners from that Subclass. The only exception is for prisoners who work an average of twenty hours a week or more – for these prisoners the district

court asked the parties to develop a plan to ensure they were no longer counted as part of the Subclass.  Instead, Defendants appealed.

The district court's rulings are not appealable under 28 U.S.C. § 1291. There is no "final" order here in which to ground appellate jurisdiction; rather, the orders at issue simply interpret the Subclass definition set forth in the Stipulation. *See Jeff D. v. Kempthorne*, 365 F.3d 844, 850 (9th Cir. 2004) (district court's post-judgment order interpreting class definition is not appealable under § 1291). Likewise, appellate jurisdiction is lacking under 28 U.S.C. § 1292(a)(1), as the district court's orders merely interpret the isolation Subclass definition; they are not injunctive in nature and do nothing to modify the Stipulation.

Even if this Court had jurisdiction, the district court was well within its broad discretion to interpret the isolation Subclass as it did.  In the face of Defendants' wholesale attempt to redefine the Subclass and modify the Stipulation by creating new labels for the same prisoners, the district court required Defendants to provide evidence to meet their heavy burden of demonstrating changed conditions for some members of the isolation Subclass.  The district court did not err in concluding that Defendants failed to meet this burden, where their evidence did not establish the amount of out-of-cell time available to any given prisoner.  Although the district court did not rest its decision on the plain language of the Subclass definition, that definition – which explicitly includes both prisoners

held in specified isolation conditions *and* those housed in designated units – provides an alternative ground for affirmance. This Court should dismiss the appeal for lack of jurisdiction; in the alternative, the orders of the district court should be affirmed.

## ARGUMENT

### I. THIS COURT LACKS JURISDICTION TO HEAR THIS APPEAL

The threshold issue in this appeal is the Court's jurisdiction. The district court's orders here are interpretative and non-final, and are not injunctive in nature. They merely interpret the scope of the isolation Subclass, and do not require Defendants to take, or refrain from taking, any action whatsoever. ER 005-009; ER 001-004.

These orders merely confirm that, consistent with the plain language of the Stipulation, prisoners confined for 22 hours or more each day or housed in particular housing units remain part of the isolation Subclass regardless of the label Defendants affix to them – except for those prisoners who work 20 hours or more each week. ER 002-003. In particular, the district court noted in its denial of Defendants' "Motion for Relief from Order" that it was not redefining the Subclass:

> It appears that Defendants have based this argument on a misunderstanding of the Court's Order. In concluding that any inmate who worked "at least" 20 hours a week was not part of the Subclass,

the Court understood that this could be an average and asked the parties to develop a workable way to monitor based on that definition.

ER 002-003.  The district court went on to note in this order:

> Because it appears that Defendants have misunderstood the Court's Order, it is worth reiterating that the Court is not requiring Defendants to re-categorize close custody inmates as maximum custody inmates for correctional purposes.  Instead, the Court has indicated who counts as part of the Subclass for the purpose of monitoring compliance with the Stipulation.

ER 003.  Neither of these orders is appealable.

## A. The Order at Issue is Not Final and is Therefore Not Appealable under 28 U.S.C. § 1291.

Defendants offer several grounds for appellate jurisdiction; none are sufficient.  Jurisdiction is foreclosed by this Court's holding in *Jeff D. v. Kempthorne,* 365 F.3d 844 (9th Cir. 2004).  In *Jeff D.*, this Court held that it lacked jurisdiction under 28 U.S.C. §1291 when defendants sought to appeal a post-judgment order interpreting the definition of the plaintiff class.  *Id.* at 850.  Noting that the district court's order interpreted the class definition in the consent decree in an expansive way preferred by the plaintiffs, rather than the narrow way suggested by the defendants, this court found that "[t]hat determination was clearly not final" as the district court had not yet found defendants in contempt.  *Id.* Similarly in this case, all the district court has done is interpret the definition of the isolation Subclass; there has been no order requiring Defendants to take any action as a result of that interpretation.  ER 422-447.

-13-

Defendants entirely fail to confront this Court's holding in *Jeff D.*; rather, they cite a few post-settlement orders to support their claim of appellate jurisdiction here. Opening Br. at 3. But all of those cases involved orders enforcing consent decrees or attempts by parties to withdraw from settlement agreements.[3] None of them involve the type of provisional, interpretive order at issue here and in *Jeff D.*[4]

Defendants attempt to evade the obvious lack of jurisdiction here by arguing that the district court's order was a "final" post-judgment order. Opening Br. at 2-3. But there is nothing "final" about the district court's order. Indeed, the district

---

[3] *See Flores v. Lynch*, 828 F.3d 898, 905 (9th Cir. 2016) (motion to enforce); *Gastile v. Virga*, No. 15-16294, 2016 WL 6520090, *1 (9th Cir. Nov. 3, 2016) (motion to enforce); *Tabi v. Ortega*, 649 F. App'x 413, 413 (9th Cir. 2016) (district court's order dismissing a §1983 claim pursuant to a settlement agreement); *Wilcox v. Arpaio*, 753 F.3d 872, 875 (9th Cir. 2014) (motion to enforce); *Stefano v. City of Long Beach*, 621 F. App'x 404, 404 (9th Cir. 2015) (district court's order denying a motion to set aside a settlement agreement in a §1983 action); *Gates v. Gomez*, 60 F.3d 525, 528 (9th Cir. 1995) (motions to enforce).

[4] Notably, the district court's order did not even order Defendants to produce the two prisoner files that were the genesis of the dispute. ER 007-009. Even if it had, however, post-judgment discovery and case management orders will not support jurisdiction under 28 U.S.C. § 1291. *See Plata v. Brown*, 754 F.3d 1070, 1072, 1074-75 (9th Cir. 2014) (lower court's order requiring the State to disclose its expert witnesses and their reports at least 120 days before filing a motion to terminate relief was **not** an appealable post-judgment order). Similarly, an order relating only to "conduct or progress of litigation before th[e] court ordinarily is not considered an injunction" for purposes of jurisdiction under 28 U.S.C. § 1292(a)(1). *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 279 (1988); *see also Gon v. First State Ins. Co.*, 871 F.2d 863, 865-66 (9th Cir. 1989) (although they are enforceable by contempt, orders that frame the course of litigation, such as discovery orders, are not immediately appealable as injunctions).

court specifically directed the parties to work together and propose a method for
implementing the order, or ask the court to do so.  ER 002-003; 009.  An order
directing parties to meet and confer and develop a plan is not "final" for purposes
of 28 U.S.C. § 1291.  *See Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 464 (9th
Cir.1989) ("[C]ourt orders which require the submission of detailed plans are not
final orders[.]")[5]; *cf. Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1065 (9th Cir.
2010) ("Jurisdiction for the order discussed in *Balla* would have been premature
because nothing yet had been required of defendants, other than to put effort into
developing constructive solutions to their violations of federal law, which is a step
that courts can reasonably require defendants to take in order to aid them in
structuring relief that is narrow and minimally intrusive.") (distinguishing *Balla*
where order at issue required more of defendants than the simple "submission" of a
detailed plan).

Likewise, if a district court's order is conditional or modifiable, the requisite
intent to issue a final order is lacking.  *See Disabled Rights Action Comm. v. Las
Vegas Events, Inc*., 375 F.3d 861, 870-72 (9th Cir. 2004) (concluding dismissal
order not final where no final judgment was entered, the district court reconsidered
the dismissal order, and amended it after a motion to modify was filed; however,

---

[5]  The non-appealable order at issue in *Balla* required defendants to "submit
a plan in writing within one hundred eighty (180) days . . . which will establish a
psychiatric care program [including a sex offender treatment program] for the
inmates[.]").  *Balla*, 869 F.2d at 464.

notice of appeal filed after subsequent dismissal order encompassed earlier non-final judgment); *Nat'l Distribution Agency v. Nationwide Mut. Ins. Co.*, 117 F.3d 432, 433-34 (9th Cir. 1997) (concluding order was not final where it stated "the [c]ourt may amend or amplify this order with a more specific statement of the grounds for its decision").

Here the district court's order was clearly not "final" for purposes of appellate jurisdiction under 28 U.S.C. § 1291. The court simply interpreted a provision of the Stipulation and asked the parties to develop a plan for implementing that interpretation, and explicitly contemplated the entry of further orders if necessary. ER 008-009. For the same reasons, Defendants' argument that there is appellate jurisdiction under Federal Rule of Civil Procedure 60(b) is also unavailing. Opening Br. at 4. Defendants' attempt to use Rule 60(b) to manufacture an appealable order was inappropriate because that rule does not apply to non-final orders.[6] *See, e.g.*, *United States v. Winkles*, 795 F.3d 1134, 1139 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 2462 (2016) ("Federal Rule of Civil Procedure 60(b) 'allows a party to seek relief from a final judgment, and request reopening of his case, under a limited set of circumstances.'" (quoting *Jones v.*

---

[6] Rule 60(b)'s limitation to "final" orders is made abundantly clear by the fact that it is entitled "Grounds for Relief from a Final Judgment, Order, or Proceeding." Fed. R. Civ. P. 60(b). Moreover, Rule 60(b)'s Advisory Committee Notes emphasize that the adjective 'final' applies not only to 'judgment,' but to 'order' and 'proceeding' as well. Fed. R. Civ. P. 60 advisory committee's note.

*Ryan*, 733 F.3d 825, 833 (9th Cir.2013))); *United States v. Martin*, 226 F.3d 1042, 1048 n.8 (9th Cir. 2000) ("Rule 60(b) . . . applies only to motions attacking final, appealable orders[.]").[7]

Defendants also claim that "an appeal from the Close-Custody Order is the only way Defendants can seek appellate review."[8] Opening Br. at 2-3. This is incorrect. If and when Plaintiffs move to enforce the Stipulation, Defendants can appeal any subsequent enforcement order. *See., e.g.*, *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1064 (9th Cir. 2010) ("In particular, appeals courts have jurisdiction over post-judgment orders, such as a district court might enter pursuant to the jurisdiction it has retained to enforce a prior order.").

---

[7] Plaintiffs pointed out in the district court that Defendants' motion was improper because Rule 60(b) cannot be applied to non-final orders. SUPP ER 006-008. The district court did not resolve the question, concluding that Defendants had failed to carry their burden regardless of how their motion was characterized. *See* ER 002 ("[T]he appropriate method for challenging the Court's ruling in this matter is relatively unclear. Both Federal Rule of Civil Procedure 60(b) and LR Civ. 7.2(g) [motion for reconsideration] are candidates. Under either high standard, however, Defendants are not entitled to relief.").

[8] Defendants cite *Pelletier v. Fed. Home Loan Bank of San Francisco*, 968 F.2d 865, 873 (9th Cir. 1992) to support this proposition. But *Pelletier* is inapposite here; it involved a denial of substitution of the United States as defendant under the Federal Employees Liability Reform and Torts Compensation Act (FELRTCA) at the pre-trial stage, which the court analogizes to qualified immunity, an entitlement that would be lost entirely if the case went to trial. *Id.* at 874. It is well established that an order denying qualified immunity on a question of law is immediately appealable. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) ("[W]e hold that a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.")

-17-

**1. The District Court's Order is Not Appealable Under the Collateral Order Doctrine.**

Defendants have not argued for jurisdiction under the collateral order doctrine and it would be inappropriate to establish jurisdiction here. Under this doctrine some rulings are deemed final because they are "too important to be denied review" and too independent of the merits of the case to require deferral of review. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949); *see also Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009). But the collateral order doctrine is a "narrow exception" that "should stay that way and never be allowed to swallow the general rule that a party is entitled to a single appeal[.]" *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994) (internal citation omitted); *see also Mohawk Indus.*, 558 U.S. at 106.

To warrant review under the collateral order doctrine, the order must "(1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment." *Will v. Hallock,* 546 U.S. 345, 349 (2006) (citations omitted) (internal quotation marks omitted). The order at issue here is merely an interpretation of the Subclass definition; it does not conclusively determine or resolve any issue. And, as discussed *supra*, it is an order that would be reviewable after a final ruling on a motion to enforce is issued.

The Stipulation was finalized in this matter two years ago and this litigation has already generated three appeals which this Court has consolidated. Order, Mar. 29, 2017, ECF No. 28. Although this Court has found that post-judgment orders do not raise the same concerns for avoiding piecemeal litigation as exist in other contexts, *United States v. Washington*, 761 F.2d 1404, 1406 (9th Cir. 1985), applying the collateral order doctrine here would implicate the concerns set forth in *Plata v. Brown* about opening the door to "piecemeal review of a large class of post judgment case management orders[.]" *See Plata v. Brown*, 754 F.3d 1070, 1075 (9th Cir. 2014) ("[W]hen a court identifies an order as an appealable, collateral one, it determines the appealability of all such orders." (citing *Truckstop.net, LLC v. Sprint Corp.*, 547 F.3d 1065, 1068 (9th Cir. 2008))).

## B. The Order at Issue Does Not Modify the Stipulation and is Therefore Not Appealable Under 28 U.S.C. § 1292 (a)(1).

Finally, as an alternative, Defendants briefly cite 28 U.S.C. § 1292 as a possible source of jurisdiction. Opening Br. at 3. This Court has jurisdiction over appeals from interlocutory orders "granting, continuing, modifying, refusing, or dissolving injunctions, or refusing to dissolve or modify injunctions." 28 U.S.C. § 1292(a)(1). Section 1292(a)(1) is to be construed narrowly to encompass only appeals that "further the statutory purpose of permitting litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence." *Carson v. American Brands, Inc.*, 450 U.S. 79, 84 (1981) (citations omitted)

-19-

(internal quotation marks omitted); *see also In re Touch America Holdings, Inc. ERISA Litig.*, 563 F.3d 903, 906 (9th Cir. 2009) (per curiam) (rejecting jurisdiction under Section 1292(a)(1) where parties failed to demonstrate that the lower court's disapproval of class settlement had "serious, perhaps irreparable, consequence[s]").

This Court has also held that it does not have jurisdiction over interlocutory appeals of orders that simply interpret rather than modify consent decrees. *Fisher v. Tucson Unified School Dist.*, 588 Fed. Appx. 608, 609 (9th Cir. 2014). In *Fisher*, the defendants appealed four interlocutory orders that interpreted a Unitary Status Plan (which the court "characterized as a consent decree"). *Id.* The court dismissed the defendants' appeal, holding that 28 U.S.C. § 1292(a)(1) "does not provide for jurisdiction over interlocutory appeals of orders interpreting, as opposed to modifying, consent decrees." *Id.* (citing *Thompson v. Enomoto*, 815 F.2d 1323, 1327 (9th Cir. 1987)).

In the Ninth Circuit, courts reviewing an interlocutory order involving a settlement or consent decree must look to the three part test laid out by the Supreme Court in *Carson v. Am. Brands, Inc.*, 450 U.S. 79 (1981) to determine whether the order is injunctive for purposes of jurisdiction under section 1292(a)(1). *See United States v. El Dorado County*, 704 F.3d 1261, 1263 (9th Cir. 2013) ("[A] court reviewing an interlocutory order involving a consent decree should apply *Carson*, not just section 1292(a)(1) alone, to determine

-20-

jurisdiction."); *Thompson*, 815 F.2d at 1326-27 (applying the *Carson* factors to determine whether an appeal falls under §1292(a)(1)). The *Carson* factors ask whether (1) the order has "the practical effect of the grant or denial of an injunction;" (2) the order has "serious, perhaps irreparable consequences;" and (3) the order "can be effectively challenged only by immediate appeal." *Thompson*, 815 F.2d at 1326-27 (citing *Carson*, 450 U.S. at 84).

This Court applied this framework to the interpretation of a consent decree in *Thompson v. Enomoto*, 815 F.2d at 1326-27. In that case, the court considered whether the district court's appointment of a special master to assure compliance with a decree addressing various changes in classification for death row prisoners and conditions of confinement in a segregation unit was a modification or an interpretation of a consent decree. *Id*. at 1324-26. Although the original decree contained no specific reference to a special master, the court found that the decree "implicitly contemplates appointment of a master by retaining authority to 'establish procedures' for its compliance." *Id.* at 1327. The court then held that, since the appointment of a special master was an interpretation, not a modification, of the consent decree, the order failed the first prong of the *Carson* test and was not appealable. *Id.*

Here, the district court engaged in a far more modest interpretation of the Stipulation, simply determining which prisoners are included in the isolation

Subclass. ER 001-003. As with *Thompson*, the order was made pursuant to the original Stipulation and not a modification of it; the order appealed from here "does not have the practical effect of the grant or denial of an injunction." *Thompson*, 815 F.2d at 1327. Nor is there any evidence to address the other *Carson* factors – Defendants have established no "serious, perhaps irreparable consequences" as a result of the district court's order; and it is clear that Defendants can seek review of the present interlocutory order if and when the district court rules on a motion to enforce. *Armstrong*, 622 F.3d at 1064.

## II. EVEN IF THIS COURT HAD JURISDICTION, THE DISTRICT COURT PROPERLY FOUND THAT DEFENDANTS PROVIDED INSUFFICIENT EVIDENCE TO JUSTIFY REDEFINING THE SUBCLASS

### A. Standard of Review

This Court reviews the denial of a Rule 60(b) motion for abuse of discretion. *See, e.g.*, *Carreon v. Barr*, 66 F.3d 334 (9th Cir. 1995). "The judgment below must be affirmed unless (1) we have 'a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon weighing the relevant factors,' (2) the district court applied the wrong law, or (3) the district court rested its decision on clearly erroneous findings of fact." *Delay v. Gordon*, 475 F.3d 1039, 1043 (9th Cir. 2007) (quoting *SEC v. Coldicutt*, 258 F.3d 939, 941 (9th Cir. 2001)); *see also De Saracho v. Custom Food Mach., Inc.*, 206 F.3d 874, 880 (9th Cir. 2000) ("We review the district court's denial of a Rule

60(b) motion for an abuse of discretion and will reverse 'only upon a clear showing of abuse of discretion.'" (quoting *Molloy v. Wilson*, 878 F.2d 313 (9th Cir. 1989))).

Abuse of discretion presents a very high threshold for appeal. *See e.g., Casey v. Albertson's Inc.*, 362 F.3d 1254, 1257 (9th Cir. 2004) ("A district court abuses its discretion if it does not apply the correct law or if it rests its decision on a clearly erroneous finding of material fact."); *P. v. Riles*, 502 F.2d 963, 964 (9th Cir. 1974) (citations omitted) (internal quotation marks omitted) ("An abuse of discretion has been defined as a plain error, discretion exercised to an end not justified by the evidence, a judgment that is clearly against the logic and effect of the facts as they are found."). The district court's interpretation of evidence is entitled to particularly deferential review. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it[.]"); *see also id.* ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

Alternatively, should the Court decide that Defendants' motion was actually a motion for reconsideration pursuant to District of Arizona Local Rule of Civil Procedure 7.2(g)(1), the standard of review remains abuse of discretion. *See*

*Trader Joe's Co. v. Hallatt*, 835 F.3d 960, 965 n.3 (9th Cir. 2016) ("We review for an abuse of discretion a district court's denial of a motion for reconsideration[.]"); *Rishor v. Ferguson*, 822 F.3d 482, 495 (9th Cir. 2016) ("We review the district court's grant of Rishor's motion for reconsideration for abuse of discretion."); *see also Bias v. Moynihan*, 508 F.3d 1212, 1223 (9th Cir. 2007) ("Broad deference is given to a district court's interpretation of its local rules." (quoting *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002))); *Hinton v. Pac. Enterprises*, 5 F.3d 391, 395 (9th Cir. 1993) ("A determination of compliance with local rules is reviewed under an abuse of discretion standard." (citing *Yagman v. Republic Ins.*, 987 F.2d 622, 630 (9th Cir. 1993))).

### B. The District Court Properly Based its Decision on Evidence Provided by Defendants.

While Defendants accuse the Court of "redefin[ing] the subclass" (SUPP ER 011; Opening Br. at 20-23) it is *Defendants* who are doing so, seeking to exclude prisoners who are explicitly included in the subclass definition simply by changing their label from "maximum custody" to "close custody." Likewise, contrary to Defendants' assertion, the district court did **not** modify the terms of the Stipulation. Opening Br. at 25-26. Rather, it is Defendants who sought to change the terms of the decree by redefining the isolation Subclass to exclude certain prisoners living in Florence-Central Unit. As such, it was Defendants' burden to demonstrate to the district court that the conditions of those prisoners had changed

in some significant, material way. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992); *Jeff D.*, 365 F.3d at 851. The district court's conclusion that Defendants failed to carry this burden was not an abuse of discretion.

### 1. Defendants Failed to Meet the High Standards of Either Rule 60(b)(6) or LR Civ. 7.2(g).

The district court noted that "the appropriate method for challenging the Court's rulings in this matter is relatively unclear. Both Federal Rule of Civil Procedure 60(b) and LR Civ. 7.2(g) are candidates. Under either high standard, however, Defendants are not entitled to relief." ER 002. The district court's uncertainty was a result of Defendants' improper pleading. In their "motion for relief" Defendants cited Federal Rule of Civil Procedure 60(b) without acknowledging that the subsections of Rule 60 cover distinct factual scenarios and have distinct tests. ER 0015-0016. For Rule 60(b)(6), "[a] movant seeking relief under Rule 60(b)(6) must show extraordinary circumstances justifying the reopening of a final judgment." *Jones*, 733 F.3d at 833 (internal quotation marks and citations omitted); *see also Lal v. California*, 610 F.3d 518, 524 (9th Cir. 2010) ("We use Rule 60(b)(6) sparingly as an equitable remedy to prevent manifest injustice." (internal quotation marks and citation omitted)). Nowhere in Defendants' motion did they even assert, let alone present evidence of, such "extraordinary circumstances." SUPP ER 010-011.

Defendants' filing in the district court was really a thinly-disguised motion for reconsideration. But here too, they could not possibly meet the high standard required and made no effort in their brief to do so, either in this Court or in the court below. District of Arizona Local Rule of Civil Procedure 7.2(g)(1) provides:

> The Court will ordinarily deny a motion for reconsideration of an Order absent a showing of manifest error or a showing of new facts or legal authority that could not have been brought to its attention earlier with reasonable diligence. Any such motion shall point out with specificity the matters that the movant believes were overlooked or misapprehended by the Court, any new matters being brought to the Court's attention for the first time and the reasons they were not presented earlier, and any specific modifications being sought in the Court's Order. No motion for reconsideration of an Order may repeat any oral or written argument made by the movant in support of or in opposition to the motion that resulted in the Order. Failure to comply with this subsection may be grounds for denial of the motion.

LRCiv 7.2(g)(1).

"Motions for reconsideration are disfavored and should be granted only in rare circumstances." *United States v. Vistoso Partners*, No. CV10–0444 PHX DGC, 2011 WL 2550387, at *1 (D. Ariz. June 27, 2011); *accord Smart v. Ashcroft*, 36 F. App'x 909, 910 (9th Cir. 2002) ("The district court did not abuse its discretion in denying Smart's requests for reconsideration, which it treated as motions for reconsideration under Local Rule 7.16. 'Only in rare cases will we question the exercise of discretion in connection with the application of local rules.'" (quoting *United States v. Warren*, 601 F.2d 471, 474 (9th Cir. 1979)).

Examining Defendants' evidence, the district court properly found neither the "rare circumstances" under District of Arizona Local Rule of Civil Procedure 7.2(g)(1), nor the "extraordinary circumstances" required by Federal Rule of Civil Procedure 60(b)(6) were established. ER 002-003.

## 2. Defendants Failed to Provide Credible Evidence to Support their Claim.

The district court ordered Defendants to provide credible evidence that the prisoners they had re-classified as "close custody" were not subject to substantially similar conditions as those prisoners held in maximum custody. ER 0012; ER007-008.[9]

Once the Defendants provided the court with evidence, the district court's inquiry involved a determination whether that evidence established that the conditions of confinement in "close custody" and "maximum custody" were not substantially similar. After reviewing the evidence, the district court found that Defendants' submission did not contain sufficient, credible evidence to show that prisoners in "close custody" were *not* held in substantially similar conditions as those in maximum custody. Based on the evidence provided by the Defendants –

---

[9] Contrary to Defendants' assertions, the district court did not issue an order "effectively expand[ing] the obligations Defendant-Appellants have under the Stipulation." Opening Br. at 1. Rather, the district court issued an order inviting Defendants to provide credible evidence to allow the court to assess whether the new designation of "close custody" in the designated maximum custody units fell within the scope of the definition of the Subclass found in the Stipulation.

evidence that contained only "theoretical" possibilities for out-of-cell activities – the court ruled that most "close custody" prisoners remained part of the Subclass. ER 008-009; 002-004.

In particular, the District Court noted that Defendants' assertion that "close custody" prisoners were guaranteed 15.5 hours out-of-cell time a week compared with the 14-hour minimum used to define the Subclass was not supported by "admissible evidence" because the Defendants' evidence focused on "offered or potentially available out-of-cell time" without establishing that 15.5 hours was *actually* available for all "close custody" prisoners. ER 002. Instead, the Defendants offered only a laundry list of possible activities. The district court repeatedly invited Defendants to produce additional evidence. ER 003 nn.1 & 2. They never responded.

The evidence proffered by Defendants for "close custody" out-of-cell time provided a theoretical laundry list of possible activities.[10] ER 008; ER 0022-26. Although Defendants assert that as of November 21, 2016 there were 578 cells classified as "close custody" at the Florence-Central Unit, they offer no indication how many of those prisoners are able to participate in out-of-cell activities or how

---

[10] Defendants complain in their brief – without any citation to evidence – that it was impossible for them to provide evidence of *actual* out-of-cell time for "close custody" prisoners because they never monitored that time. Opening Br. at 22. This is absurd since the plain language of the Subclass definition always required Defendants to monitor Florence-Central, the unit in question. ER 0081. Defendants' evidentiary default is thus no one's fault but their own.

often most of the activities are actually offered. ER 0020; 0022-0026. Where more specific information is provided, such as "Cognitive Behavior" programming (1 hour on Thursdays for 12/13 prisoners in Cell Block 3) or "Re-entry" programming (1 hour on Wednesdays for 11 prisoners in Cell Block 4) it is clear that only a very small minority of the 578 prisoners labeled "close custody" have access to such activities. ER0024-0025.

Moreover, in asserting that all prisoners had access to at least 15.5 hours per week of out-of-cell activities, Defendants included activities that are plainly not available to all prisoners, such as visitation, religious services, and trips to commissary. But some prisoners do not have friends or family who visit them; are not religious and therefore do not participate in religious services; or have no money to spend on commissary.[11] Opening Br. at 15; ER 0022-0026. For other

---

[11] "Close custody" prisoners might also experience reduced out-of-cell time due to ADC's discipline policy. Under that policy all prisoners are subject to "loss of privilege" for disciplinary infractions, including such infractions as "horse play" and "disrespect." *See* ADC's Inmate Disciplinary Procedure, D.O. 803, at 29-31 (effective date October 16, 2016), https://corrections.az.gov/sites/default/files/policies/800/0803.pdf. "Loss of privilege" may include any or all of the following: 1) access to the inmate store for non-sanitary items, ii) telephone access, iii) visitation, iv) educational opportunities, v) work opportunities, and/or vi) any other loss of privilege determined appropriate by the Disciplinary Hearing officer. *Id.* at 20. As a result, potential out-of-cell time for "close custody" prisoners is even more theoretical than found by the district court. Plaintiffs request that the Court take judicial notice of this policy as it appears on the Arizona Department of Corrections website. *See, e.g.*, *Daniels–Hall v. National Education Association,* 629 F.3d 992, 998-99 (9th Cir. 2010) (taking judicial notice of information on the websites of two

activities, such as education, horticulture class, and library, Defendants offer no evidence of how many prisoners were actually given such out-of-cell opportunities. Opening Br. at 15; ER 008-009; ER 0022-0026.[12]

By contrast, when Defendants did provide specific evidence that 276 of the "close custody" prisoners worked at 20 different positions for an average of 30 hours a week, specifying the job titles and the number of prisoners allotted to each of the enumerated jobs, the district found that the Defendants *had* provided sufficient evidence that those conditions were substantially different than those in maximum custody, and held that those 276 prisoners would not be considered part of the Subclass for purposes of the Stipulation. ER 008-009.

Here the district court properly acted to prevent Defendants from depopulating the Subclass by redefining the Subclass definition.[13] It is the district

---

school districts because they were government entities where neither party "dispute[d] the authenticity of the websites or the accuracy displayed therein."); *In re Amgen Inc. Sec. Litig.,* 544 F. Supp. 2d 1009, 1023–24 (C.D. Cal. 2008) (judicial notice of drug labels taken from FDA's website); *County of Santa Clara v. Astra USA, Inc.,* 401 F. Supp. 2d 1022, 1024 (N.D. Cal. 2005) (taking judicial notice of information posted on a U.S. Department of Health and Human Services website).

[12] The district court added that, even if Defendants had provided admissible evidence that all "close custody" prisoners received 15.5 hours a week out of cell, this amounted to a mere 13 minutes a day more than the 14 hours set forth in the Subclass definition, which the court characterized as "a distinction without a difference." ER 002.

[13] Defendants' arguments based on Federal Rule of Civil Procedure 23, Opening Br. at 22-23, are meritless, based as they are on the false premise that the district court modified the Subclass definition. As explained *supra,* it did not.

court's duty to protect the interests of the class, including in the post-settlement context. *Rodriguez v. Disner*, 688 F.3d 645, 655 (9th Cir. 2012) ("[T]he district court has a special duty to protect the interests of the class[.]") (quoting *Staton v. Boeing Co.,* 327 F.3d 938, 970 (9th Cir.2003)). Given its careful analysis of Defendants' evidence, there is no basis for concluding that the district court abused its discretion.[14]

---

[14] Defendants assert that the district court's order "strongly suggests (if not orders) that Defendants' obligations under the Stipulation's Paragraphs 17-28 and the Maximum Custody Outcome Measures now extend to close-custody inmates." Opening Br. at 25. But "strong suggestions" are not appealable, and in any event, a plain reading of the district court's order reveals that it does no such thing. The district court merely interpreted the scope of the isolation Subclass; it did not enforce the substantive terms of the Stipulation or find Defendants in contempt. ER 002-003.

Defendants also make much of the fact that the term "maximum custody" was used throughout much of the Stipulation rather than the term "Subclass." Opening Br. at 23-24. As the district court noted, the Subclass members "were historically considered maximum custody inmates" in the Arizona Department of Corrections. ER 001. Moreover, the enumerated units in the Subclass constituted the maximum custody facilities in Arizona at the time the Court crafted the Class Certification Order defining the Subclass. ER 0011. As a result, it was natural to use the term "maximum custody" for the isolation Subclass throughout the Stipulation, including in some of the protocols for the performance measures. ER 00141-145.

**III. IN THE ALTERNATIVE, THE PLAIN LANGUAGE OF THE SUBCLASS DEFINITION SUPPORTS THE DISTRICT COURT'S RULING**

**A. Standard of Review**

This Court may affirm a district court on any alternative ground supported by the record. *Muniz v. United Parcel Serv., Inc.*, 738 F.3d 214, 219 (9th Cir. 2013); *Hall v. N. Am. Van Lines, Inc.,* 476 F.3d 683, 686 (9th Cir. 2007).

**B. The Subclass Definition in the Class Certification Order and Stipulation Clearly Supports the District Court's Holding.**

The Court crafted the subclass definition in its March 5, 2013 Class Certification Order.[15]  ER 150.  This same definition was subsequently incorporated into the Stipulation without alteration.  ER 0081; Doc. 1185 at 1.  The definition of the isolation Subclass here is straightforward and unambiguous.  The subclass is defined as "All prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day *or* confinement in the following housing units:  Eyman-SMU I; Eyman-Browning Unit;  Florence-Central Unit;  Florence-Kasson Unit;  or Perryville-Lumley Special Management Area."  ER 0081 ¶ 3 (emphasis added).

Defendants essentially argue that the district court should have read the term "maximum custody" into the Subclass definition because it is a term used in other

---

[15] *Parsons v. Ryan*, 289 F.R.D. 513 (D. Ariz. 2013), *aff'd*, 754 F.3d 657 (9th Cir. 2014).

parts of the Stipulation. Opening Br. at 23-24. But as the district court previously noted, the Subclass definition is a product of the original Class Certification Order – not the Stipulation. ER 0011.

Defendants simultaneously assert that the only part of the isolation Subclass definition that should be considered is the first phrase: "confinement in a cell for 22 hours or more each day" or, put another way, receiving 14 hours a week of out-of-cell time or less. Opening Br. at 19-20. They then argue that any prisoner receiving out-of-cell time for 14 hours and one minute a week must be excluded from the isolation Subclass. Opening Br. at 20. It was precisely to avoid this kind of gamesmanship that the district court set forth a subclass definition that included both conditions of confinement *and* housing location. ER 150.

A straightforward review of the plain language of the isolation Subclass definition forecloses both of Defendants' arguments. It is axiomatic that "[t]he interpretation of a settlement agreement is governed by principles of state contract law." *Botefur v. City of Eagle Point*, 7 F.3d 152, 156 (9th Cir. 1993) (quoting *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1990)). The starting point for interpreting a contract is the plain meaning of the contractual language, and courts may rely on dictionary definitions to construe words contained in a contract. *See, e.g.*, *Poland v. Martin*, 761 F.2d 546, 548 (9th Cir. 1985). Likewise, the starting point for interpreting a court order is the plain meaning of the text. *In re Cement*

*and Concrete Antitrust Litig.*, 817 F.2d 1435, 1442-43 (9th Cir. 1987) (starting with the plain language of the class definition in reviewing a lower court's interpretation of an existing class definition), *vacated on other grounds*, 940 F.2d 1583 (9th Cir. 1991).

The word "or" in this definition is central to its meaning. Here "or" is "used as a function word to indicate an alternative <coffee or tea> <sink or swim>." *See* Merriam-Webster, http://www.merriam-webster.com/dictionary/or (last visited April 17, 2017). Interpreting the plain language of the Stipulation, the subclass includes all prisoners who are **either** "subjected by the ADC to . . . confinement in a cell for 22 hours or more each day" **or** those prisoners who are subject to "confinement in the following housing units: Eyman-SMU I; Eyman-Browning Unit; Florence-Central Unit; Florence-Kasson Unit; or Perryville-Lumley Special Management Area." Because the prisoners at issue in this appeal are all housed in Florence-Central Unit, they are plainly members of the isolation Subclass.

The district court's holding that the Subclass continues to include all prisoners in the enumerated units regardless of whether they are labeled "close" or "maximum" custody – with the exception of those who work 20 hours per week or more – is thus consistent with the plain language of the Subclass definition.

## CONCLUSION

The appeal should be dismissed for lack of jurisdiction. In the alternative, the order of the district court should be affirmed.

Dated: May 12, 2017

Respectfully submitted,

ACLU National Prison Project


By: s/ Amy Fettig
Amy Fettig

*Attorney for Prisoner Plaintiffs-Appellees*


ARIZONA CENTER FOR DISABILITY LAW


By: s/ Maya Abela
Maya Abela

*Attorney for Plaintiff-Appellee Arizona Center for Disability Law*

## STATEMENT OF RELATED CASES

This Court previously adjudicated the appeal of class certification in this lawsuit, Ninth Cir. No. 13-16396. *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014).

There are two related appeals pending in this Court. Both arise out of the same case in the district court, and both have been consolidated with this appeal: *Parsons v. Ryan*, Ninth Cir. No. 16-17282, filed by Defendants, addresses whether a specific remedial order issued by the district court exceeded its authority. The related appeal, filed by Plaintiffs, Ninth Cir. No. 17-15302, addresses whether and how the district court may address staffing shortages in a remedial order.

**Form 8.** **Certificate of Compliance Pursuant to 9th Circuit Rules 28-1.1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** 16-17282
17-15302, 17-15352 (Consolidated)

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28-1.1.
The brief is ⬚ words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☒ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is 10,025 words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is ⬚ words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated ⬚
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is ⬚ words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is ⬚ words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is ⬚ words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is ⬚ words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant s/ Amy Fettig     Date May 12, 2017

("s/" plus typed name is acceptable for electronically-filed documents)

**Certificate of Service When All Case Participants are CM/ECF Participants**

I hereby certify that on May 12, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: May 12, 2017                      s/ Amy Fettig
                                         Amy Fettig